HERSHEY FARMS, INC., Claimant, *v.* STATE OF NEW YORK, Defendant. Claim No. 30282.)

HERSHEY FARMS, INC., Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30283.)

HERSHEY FARMS, INC., Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30284.)

Court of Claims, February 7, 1952.

*William M. Chadbourne, Gerald B. O'Neill* and *Allen G. Miller* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Donald C. Glenn* and *Gerald Sokoloff* of counsel), for defendant.

Young, J.  The State of New York had a contract, designated P-252, with the claimant under which the claimant delivered milk and cream to certain State institutions from July 1, 1948, to June 30, 1949.  Performance of this contract was completed by the claimant and payment was made by the State with the exception of the sum of $34,124.81, which the State has retained for damages it alleges it sustained when claimant breached two contracts, hereinafter described, running from July 1, 1949, to June 30, 1950.  Under the terms of a stipulation entered into between the parties, dated November 9, 1950, the State paid the claimant $24,899.14 of the amount withheld under contract P-252 and Claim No. 30282, which sought the full amount, was reduced in demand to $9,225.67.

In June, 1949, the Division of Standards and Purchase, State of New York, invited bids on proposed milk contracts for State institutions for the year July 1, 1949, to June 30, 1950.  As a result of the bidding, claimant was awarded two contracts, one, P-3971, for milk and cream deliveries to Manhattan State Hospital, Psychiatric State Hospital, Brooklyn State Hospital and Creedmoor State Hospital, and the other, P-4083, for milk and cream deliveries to Willowbrook State School.  Hereinafter contract P-3971 will be referred to as the '' Brooklyn '' contract and P-4083 as the '' Willowbrook '' contract.

Claimant delivered milk under the Brooklyn contract until July 11, 1949, when the contract was cancelled by the State. Claim No. 30284 seeks $10,639.88, being the value of the milk delivered under this contract for the eleven days it was in force and $24,455.91, damages for the State's alleged breach.

Claimant delivered milk under the Willowbrook contract until July 14, 1949, when the contract was cancelled by the State. Claim No. 30283 seeks $1,032.40, being the value of the milk delivered under this contract for the fourteen days it was in force and $4,056.66, damages for the State's alleged breach.

Immediately following the cancellation of each of these contracts the State made contracts for the balance of the contract year with the bidder who was next lowest at the time that the claimant was the successful bidder.  As a result the State was caused to pay $19,524.96 in the case of the Brooklyn contract and $1,372.99 in the case of the Willowbrook contract more than it would have, had the claimant's contracts been continued and completed.  The State is counterclaiming for the total of these amounts, $20,897.95.

On July 6, 1949, a maggot was found in the milk in one of the wards of the Brooklyn State Hospital. An investigation of the milk handling in the hospital was ordered by Mr. Heilman, the senior business officer, and an inspection was made the next day by an agent of the State Department of Agriculture and Markets. The inspection disclosed that the milk in one can was dirty and this can was returned to the claimant. Many of the cans were not sealed and about 25% of the cans were not fit for use. The results of the inspection were reported to the Division of Standards and Purchase.

On July 11, 1949, the claimant's deliveryman brought the milk, early in the morning, to the Brooklyn State Hospital where he was met by a hospital patrolman whose duty it was to check the number of cans, see if they were full and to ascertain if the milk was visibly clean. The patrolman's hand had been injured and that morning he was slow in opening the cans so that by the time the deliveryman had completed his work at the reception kitchen of the hospital, the patrolman had opened only about half of the cans delivered. He was unable to check these because the milk was foamy from its recent handling. Before completing his work at the reception kitchen, the patrolman followed the deliveryman to the staff kitchen, did his work there and returned to the reception kitchen to finish the job. One of the cooks started helping him.

When the two men broke the seals and opened some of the cans they observed living maggots floating in the milk. Another cook was called to witness, more cans were opened and more maggots found. Mr. Heilman was called and he opened three sealed cans and found maggots. He also discovered that in some of the cans there was a brownish colored scum, which appeared to be a deposit of old milk, on the inside of the sloping shoulder of the can.

The New York City department of health and the claimant's plant were notified and both sent men to the hospital. The Division of Standards and Purchase was notified and an inspection was requested which resulted in an agent of the Department of Agriculture and Markets being sent to the hospital. After a conference among these men later in the morning, the reception kitchen milk, twenty-two cans, was dumped. Mr. Heilman and the Department of Agriculture and Markets reported to the Division of Standards and Purchase who cancelled the Brooklyn contract.

During this same time claimant was delivering milk under the Willowbrook contract and, because of the Brooklyn incident, the Division of Standards and Purchase, as a matter of routine, ordered an inspection of the Willowbrook milk. This was made on July 14, 1949, by an agent of the Department of Agriculture and Markets. A dead fly was found in one can and in seven or eight others there was dirt and foreign matter. One of the cans, a Monitor type, was leaking and was not examined. These findings were reported by telephone to the Division of Standards and Purchase and the Willowbrook contract was cancelled.

The claimant alleges performance of all of the conditions of the contracts on its part. The *sine qua non* of performance is wholesome milk and it goes without saying that dirty or maggot-infested milk is unfit for human consumption.

The maggots found in the milk were determined to be those of the blowfly or blue bottle fly. The eggs of this fly are laid, among other places, on food. After about ten days in the egg stage, the fly goes into the larva stage. After five days, it goes into the capsule stage for one to two weeks before emerging as an adult fly. It was conclusively established to the satisfaction of the court that the maggots were in the cans when the seals were broken and the cans opened. It is an entomological impossibility that the maggots could have generated themselves into being or could have arrived at the maggot stage in a matter of seconds, minutes or a few hours.

The claimant has given testimony that this milk was processed through its plant in the usual and customary manner, that its plant and its processes are modern, sanitary and approved and that no living organism could survive the can-washing and pasteurization procedure. The weight of this evidence cannot overbalance the fact that when the cans were opened the maggots were there.

Moreover, the claimant has not excluded all of the possibilities. There is evidence that occasionally cans come out of the washer dirty. There is evidence that the cans are not always used as soon as they come from the washer. They are sometimes stacked to one side, to be used when needed. It is a distinct possibility that some cans could have come through the washer dirty, not have been detected or covered immediately, then set aside to be used some other day without having been rewashed. Added to the universal knowledge that personnel are not always faultless is the evidence, albeit tenuous, that the claimant had labor problems at its plant.

Without theorizing further, there is but one conclusion — the milk delivered to Brooklyn State Hospital on July 11, 1949, and to Willowbrook on July 14, 1949, was not the wholesome product contemplated by the contract and to that extent, at least, the claimant failed in performance.

It is the claimant's contention that the State could only cancel its contract for consistent failure to deliver as ordered and that the State's remedy for a single defective delivery was to reject the defective items and to repurchase from other sources if the supplier failed to replace the defective items or if the facts made an outside purchase necessary. It bases its position both on the specifications of the contract and the law with respect to installment contracts.

The provisions of the specifications cited by the claimant and the State are:

" 47. Upon failure of the Contractor to deliver within the time specified, or within reasonable time as interpreted by the Commissioner, or failure to make replacement of rejected articles, when so requested, immediately or as directed by the Commissioner, the Commissioner may purchase from other sources to take the place of the item rejected or not delivered. The Commissioner reserves the right to authorize immediate purchase from other sources against rejections on any contract when necessary. On all such purchases the Contractor agrees to promptly reimburse the State for excess costs occasioned by such purchases. Should the cost be less, the Contractor shall have no claim to the difference. Such purchases will be deducted from contract quantity.

" 48. A contract may be cancelled at the Contractor's expense upon non-performance of contract. Failure of the Contractor to furnish additional surety within ten (10) days from date of request shall be sufficient cause for the cancellation of the contract.

" 49. If Contractor consistently fails to deliver as ordered, the Commissioner reserves the right to cancel the contract and purchase the balance from other sources at the Contractor's expense."

There can be no doubt that it was the object of these contracts to furnish the inmates of State institutions with wholesome and pure milk. The specifications must be construed to effectuate the purposes of the contract. (*Grundt* v. *Shenk*, 222 App. Div. 82, affd. 248 N. Y. 602.) Every specification must be read as a part of the whole and no special meaning should be given to it as a part isolated or out of context. (*Fleischman* v. *Furgueson*,

223 N. Y. 235; *Paige* v. *Faure,* 229 N. Y. 114.) Words and phrases must be given their natural meaning. (*Brainard* v. *New York Central R. R. Co.,* 242 N. Y. 125.)

Specification No. 47, cited by the claimant, defines the relief available to the Commissioner of Standards and Purchase when the contractor fails " to deliver *within the time specified,* or within reasonable time ", or fails " to make replacement of rejected articles, *when so requested* ". (Italics supplied.) Time of delivery is not a question in this case. The remainder of the sentence does not logically support the meaning that it is mandatory for the commissioner to demand replacement of rejected articles. The words, " when so requested ", can only mean that the commissioner has discretion to order replacement.

Specification No. 49 undoubtedly gives the commissioner the right to cancel when there is a consistent failure to deliver as ordered. Yet, it must be borne in mind that these contracts deal with milk for human consumption, a product that is highly perishable and easily infected. It would be idiotic to demand consistent failure to deliver a pure product as a basis for cancellation when one undetected delivery of an impure product could cause sickness, epidemic and death, especially in a State institution whose inmates do not have normal vitality and resistance.

Specification No. 48 gives added weight to the court's construction.

When an installment contract has been breached by delivery of one installment of inferior quality, the answer whether or not the entire contract can be cancelled by the buyer without liability lies in the facts of each case. (*Helgar Corp.* v. *Warner's Features,* 222 N. Y. 449.) In the final analysis, the decision is not a matter of law but one of conscience. This rule has found embodiment in the Uniform Sales Act and section 126 of the Personal Property Law.

In the cases cited by the claimant the articles delivered under contract were glass, puzzles, pliers and pulpwood. If the contract articles were equally as innocuous in the present instance, the court would have no trouble subscribing to the claimant's position. As we have pointed out, however, we are dealing here with an easily infected and highly perishable food. The improper handling of milk can be as catastrophic as the improper handling of dynamite. The State has recognized this danger by specifically declaring the laws of milk control to be an exercise of its police power. (Agriculture and Markets Law, § 3.)

When we consider all of the regulations with which the State has surrounded the production and distribution of milk, and taking into account the consequences that could flow from one delivery of impure milk and realizing the special duty of care that the State must exercise towards its wards, confined in its institutions, we are constrained to the opinion that one delivery of contaminated milk is sufficient cause to warrant cancellation of the contract. This the court holds even though it is of the opinion that the State was justified in cancelling these contracts because the evidence does show a consistent breach in that maggots were found on July 6, 1949, and July 11, 1949, in the Brooklyn milk and the presence of a fly and dirty milk on July 14, 1949, at Willowbrook.

The claimant having breached the contract is liable to the State on its counterclaim, and it is the State's burden to prove its damages by the proper measure.

" Where the article purchased can be procured by the buyer in the market, he is entitled to recover as the general damages the difference between the market or current value of the property and the agreed price, less any part of the price which has been paid.'' (1 New York Law of Damages, § 261, pp. 437, 438, citing numerous cases; Personal Property Law, § 148.)

As proof of the market value the State gave evidence of the price paid under the completion contracts, showing also that it was the bid next lowest to claimant's. To combat this, the claimant alleges that the completion contracts were not legally entered into. The claimant's burden was not to show that the completion contracts were illegal, or even fraudulent, but that the prices paid thereunder were not the market value. This the claimant failed to do.

The court holds that the completion contract prices were the fair market value not merely because that was the price the State paid (*Kennedy* v. *McKone,* 10 App. Div. 88), but because they were the bids next lowest to claimant's, had been made only a month before acceptance, and were not refuted by any evidence on the part of the claimant.

All evidence concerning the completion contracts which was objected to and on which decision was reserved is hereby admitted, but only for the purpose of showing market price.

Awards are made in an accompanying decision.